UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

KARA BAKER,                                )
            Plaintiff,                     )
                                   )
    vs.                                       )          1:10-cv-1556-RLY-DML
                                   )
ENTERPRISE LEASING COMPANY OF  )
INDIANAPOLIS, INC.,                    )
              Defendant.               )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, Kara Baker ("Plaintiff"), is a former employee of the defendant,

Enterprise Leasing Company of Indianapolis, Inc. ("Enterprise").  Following her

termination, Plaintiff brought the present action alleging that Enterprise terminated her

employment because of her pregnancy and/or in retaliation[1] for her pregnancy

discrimination complaints under Title VII of the Civil Rights Act of 1964, as amended by

the Pregnancy Discrimination Act ("PDA"), and that Enterprise denied her leave to which

she was entitled under the Family and Medical Leave Act ("FMLA").  Enterprise now

moves for summary judgment.  For the reasons set forth below, its motion is **GRANTED**.

**I.    Factual Background**

    **A.    Plaintiff's Employment with Enterprise**

Enterprise is in the automobile rental, leasing, and car sales business.  (Affidavit of

---

[1] Plaintiff withdrew her Title VII retaliation claim.  (*See* Docket # 53).

1

Jared Thompson ("Thompson Aff.") ¶ 3).  Plaintiff began working at Enterprise on May 24, 2004, in a management trainee position.  (Deposition of Kara Baker ("Plaintiff Dep.") at 83).  On October 1, 2006, Enterprise promoted her to Branch Manager of its Vincennes, Indiana, Branch (designated as "0855") and its Sullivan, Indiana, Satellite Office (designated as "0839").  (*Id*. at 92, 153).  The Vincennes Branch was a Level C Branch, which is Enterprise's smallest volume level designation, with an average of fewer than 100 rental cars in stock.  (*Id*. at 95-96; Thompson Aff. ¶ 5).  At Enterprise, a Satellite Office like Plaintiff's Sullivan, Indiana, Satellite Office, is an even lower volume secondary location and thus, Enterprise's primary concern is ensuring the strength of the primary branch.  (Deposition of Jared Thompson ("Thompson Dep.") at 25-26).

Plaintiff initially reported to Area Manager Travis Wilson ("Wilson"), and Wilson reported to Group Rental Manager Timothy Heggie.  (Plaintiff Dep. at 57, 93-94; Deposition of Kristen Farley ("Farley Dep.") at 12).  In December 2007, Plaintiff began reporting to Kristen Farley ("Farley"), who replaced Wilson as Area Manager.  (Plaintiff Dep. at 93-95).  In January 2008, Farley began reporting to the new Group Rental Manager, Jared Thompson ("Thompson").  (Thompson Aff. ¶ 2).

**B.    Plaintiff's Customer Service and Overall Performance Evaluation Scores**

According to the Branch Manager General Job Summary, Plaintiff was "responsible for the overall management and strategic direction of his or her assigned branch and/or satellite office(s) and the related field territory, with emphasis in the areas

of Management of Customer Service and Operations, Human Resource Management, Sales and Marketing/Financial Performance, and Fleet Management and Maintenance." (Plaintiff Dep. Ex. 8).

Enterprise measures customer service using a scoring system known as ESQi. (Thompson Dep. at 50-52).  A third party vendor conducts a monthly customer service survey and calculates the branch or satellite's ESQi based on customer feedback.  (*Id*.). The ESQi scores are a revolving average of the branch or satellite's score for the previous three months.  (*Id*.).  Enterprise also considers a combined ESQi score for those branches and/or satellites managed by a single employee, with the branch's ESQi score receiving more weight.  (Farley Dep. at 69-72).

In May 2007, Plaintiff received a six-month Branch Manager performance evaluation from Area Manager Wilson.  (Plaintiff Dep. at 138-48; Plaintiff Dep. Ex. 16). On this evaluation, Plaintiff received the overall performance rating of "requires improvement" for the review period.  (Plaintiff Dep. Ex. 16).  Wilson noted that Plaintiff's 3-month ESQi score for the Vincennes Branch and the Sullivan Satellite of 67 was a decrease from her twelve-month score of 69, and constituted a failure on her part to meet her ESQi goal of 82.  (Plaintiff Dep. at 138-48; Plaintiff Dep. Ex. 16 (noting that her ESQi scores were "unacceptable")).  Plaintiff received a "requires improvement" rating in four of the six areas of customer service management.  (Plaintiff Dep. Ex. 16).  Plaintiff acknowledged that one of her goals for the Vincennes Branch and Sullivan Satellite Office was to exceed the ESQi corporate average by July 2007.  (*Id*.).

When Farley took over the area in December 2007 from Wilson, Farley was given the task of improving the area's low ESQi scores.  (Farley Dep. at 17-18).  In Plaintiff's March 2008 performance evaluation,  Farley noticed "a tremendous increase" in Plaintiff's ESQi score, noting that in six months her average went from a 63 to a 75. (Plaintiff Dep. at 148-52; Plaintiff Dep. Ex. 17).  Farley also gave Plaintiff a "requires improvement" rating in only one area of customer service management; she received a "meets requirements" rating on the other five.  (Plaintiff Dep. Ex. 17).  Although Plaintiff was showing improvement, Farley gave Plaintiff an overall performance rating of "requires improvement." (*Id*.).  Plaintiff's goal going forward was to achieve a monthly ESQi score of at least 82. (*Id*.).  Plaintiff agreed that Farley's review of her performance was accurate and testified that she had no reason to believe the review did not reflect Farley's honestly held beliefs regarding her performance.  (Plaintiff Dep. at 149; Plaintiff Dep. Ex. 17).

In a letter dated April 18, 2008, Vice-President and General Manager of Enterprise, Karl Koch ("Koch"), congratulated Plaintiff on achieving the number 3 Branch Manager spot in the Indiana Group for March 2008.  (Affidavit of Kara Baker ("Plaintiff Aff.)," Ex. A).  The letter indicates her branch showed 23% growth, an operating profit of $112.00 per car, and a branch income growth of 7%. (*Id*.).  Thompson explained that Koch's assistant sent this form letter out to those branch managers from the Indiana Group who finished in the top three or five of a certain matrix, but that the matrix did not include a branch manager's customer service score.  (Thompson Dep. at 102).

### C.      Plaintiff's Pregnancy

Plaintiff informed Farley that she was pregnant at or around this time. (Plaintiff

Aff. ¶ 2) (testifying that "[a]t the end of March or beginning of April 2008," she informed

Farley "and others at Enterprise" that she was pregnant).  According to the record, her

due date was mid-December.  (Plaintiff Dep. at 241).  Farley responded, "Wow!  Was this

expected?"  (Plaintiff Aff. ¶ 3).  Plaintiff testified that from that moment on, her working

relationship with Farley deteriorated significantly.  (*Id*. ¶ 4).

Plaintiff did not formerly request FMLA leave for her pregnancy.  (Plaintiff Dep.

at 236).  Instead, on an undetermined date, she asked for vacation time to commence

December 15, 2008.  (*Id*.).

### D.      Plaintiff's Performance Reviews Subsequent to Her Pregnancy

After Plaintiff's March 2008 performance review, her customer service scores fell

further below the corporate average.  (Plaintiff Dep. at 165, 166, 171, 172; Plaintiff Dep.

Exs. 21, 22).  Plaintiff's 3-month Vincennes Branch customer service score dropped from

74 in March to 72 in June 2008, and her customer service score for the Sullivan Satellite

went from 81 in March to 73 in the same three-month span.  (Plaintiff Dep. Exs. 21-23).

On July 7, 2008, Farley warned Plaintiff that her customer service scores at the Vincennes

Branch and Sullivan Satellite needed immediate improvement and must meet the

corporate average within 30 days.  (Plaintiff Dep. at 177; Plaintiff Dep. Exs. 21, 22;

Farley Dep. at 62-63).  Farley memorialized her expectations for each branch/satellite in

written memorandums.  (Plaintiff Dep. at 174; Plaintiff Dep. Exs. 21, 22; Farley Dep. at

62).

During this period, Plaintiff recorded information regarding her employment in a "Significant Events Log" and in an August 9, 2008, memorandum entitled "Regarding Mistreatment from upper Management."  (Plaintiff Dep. at 99, 264; Plaintiff Dep. Exs. 9, 32).  Plaintiff expressed her frustration with Thompson and Farley, and felt that they were using her ESQi scores as a means to "get [her] out of [her] position." (Plaintiff Dep. Ex. 9).  She also felt uncomfortable talking to Farley, calling her a "bully and not a manager," and that she "kn[e]w of more employees who felt th[at] way."  (*Id*.).  Plaintiff did not submit the Significant Events Log to Enterprise management, and she could not recall whether she ever submitted the August 9 memorandum to Enterprise management. (Plaintiff Dep. at 99).

On September 4, 2008, Plaintiff received a performance review for the period ending August 2008.  (*Id*. at 152-53; Plaintiff Dep. Ex. 18).  Like her previous performance reviews, she received an overall performance rating of "needs improvement" and her 6-month ESQi score, a 74.5, was below the minimum corporate average ESQi expectation.  (Plaintiff Dep. Ex. 18).  Farley gave Plaintiff a "requires improvement" rating in four of the six areas of customer service management, and a "meets requirements" rating on the balance.  (*Id*.).  Farley noted that customer service "should be the easiest part of [Plaintiff's] job," and that, because Plaintiff now had a full staff, "there should be less caos [sic] and zero dirty cars."  (*Id*.).

Plaintiff's ESQi scores for the Vincennes Branch did not improve.  (Plaintiff Dep.

6

Ex. 23).  In November 2008, Thompson and Farley decided to take the Sullivan Satellite

away from Plaintiff's leadership, even though the Sullivan Satellite was performing better

than the Vincennes Branch and its ESQi scores reflected an upward trend, to allow her to

focus on developing staff and improving her customer service scores at the Vincennes

Branch.  (Thompson Dep. at 25-26; *see also* Farley Dep. at 54).

In a memorandum dated November 25, 2008, Farley informed Plaintiff that the

Vincennes Branch had failed to reach the minimum corporate average ESQi score for 23

of the 24 months it was under her management.  (Plaintiff Dep. Ex. 24).  Farley also

informed Plaintiff that she was expected to reach, at a minimum, the corporate average

ESQi for the month of December 2008, and that she had "every bit of confidence" that

Plaintiff would be able to accomplish this task.  (*Id*.).  The ramifications for Plaintiff's

failure to meet that goal were "further disciplinary action and/or up to termination."  (*Id*.).

### E.   Plaintiff is Terminated

On December 3, 2008, the ESQi branch ranking report for the three-month period

ending November 2008 was released.  (Thompson Dep. at 49-50; Plaintiff Dep. Ex. 23).

The ESQi score for the Vincennes Branch dropped four points to a twelve-month low of

68 against a November corporate minimum average of 80 and a twelve-month corporate

average of 79.  (Plaintiff Dep. Ex. 23).  The Sullivan Satellite, however, showed a

significant improvement for the same three-month period.  Its ESQi score went from a 74

to an 82.  (*Id*.).

Thompson contacted Farley after receiving this report.  (Farley Dep. at 51-52).

Farley and Thompson testified that Plaintiff's three-month November score for the Vincennes Branch made it virtually impossible for her to achieve the required customer service expectation needed to maintain employment.  (Plaintiff Dep. Ex. 23; Farley Dep. at 74-75; Thompson Aff. ¶ 6).  After discussing the matter, they decided Plaintiff should be terminated.  (Farley Dep. at 51-52).  Thompson confirmed the decision with his supervisor, Koch, and Group Human Resources Manager Carolyn Murphy ("Murphy").  (*Id.* at 21, 48; Thompson Dep. at 9-12).

On December 4, 2008, Plaintiff called Farley to inform her that Plaintiff's doctor scheduled a C-section for December 17, 2008.  (Plaintiff Dep. at 241).  Farley responded, "Oh, good" and "See you tomorrow."  (*Id.* at 243).

On December 5, 2008, Thompson and Farley held a meeting with Plaintiff at the Vincennes Branch and informed her that she was terminated.  (*Id.* at 221).

All other facts necessary to this opinion, including evidence of similarly situated individuals, will be addressed in the Discussion Section below.

## II.    Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The court's function is not "to weigh the evidence and determine the truth of a matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A genuine issue of material fact exists if "there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party." *Id.* at 248.  In making this determination, the court views the evidence and draws all inferences in favor of the nonmoving party.  *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e); *see also Hedberg v. Indiana Bell Tele. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995) ("Conclusory allegations by the party opposing the [summary judgment] motion cannot defeat the motion.").  If the nonmoving party fails to carry its burden, the court must grant summary judgment in favor of the nonmoving party. FED. R. CIV. P. 56(a).

## III.   Discussion

### A.   Pregnancy Discrimination

Title VII  prohibits employment discrimination on the basis of sex.  42 U.S.C. § 2000e-2(a).  The PDA, enacted by Congress in 1978, amended the definition of gender-based discrimination in Title VII to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  As with other Title VII claims, a plaintiff may prove pregnancy discrimination under either the direct method or the indirect, burden-shifting method.  *Griffin v. Sisters of St. Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007) (citation omitted).  Plaintiff proceeds under both methods of proof.

9

### 1. Direct Method

Under the direct method, a plaintiff may show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action against her was motivated by an impermissible purpose, such as sex. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Plaintiff has no direct evidence of intentional discrimination. To survive Enterprise's motion, she must, therefore, present a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decision-maker. *Id.* (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).

Plaintiff's mosaic may be comprised of three categories of circumstantial evidence, each of which is sufficient by itself to support a judgment for the plaintiff. *Troupe*, 20 F.3d at 736. The first category "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn." *Id.* The second category consists of evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment. *Id.* The third category consists of "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.* Plaintiff's circumstantial evidence "'must point directly to a discriminatory reason for the

employer's action.'"  *Rhodes*, 359 F.3d at 504 (quoting *Adams v. Wal-Mart Stores, Inc.*,

324 F.3d 935, 939 (7th Cir. 2003)).

As her first piece of circumstantial evidence, Plaintiff testified by affidavit that

before her pregnancy, Farley was friendly and helpful toward Plaintiff; after Plaintiff's

pregnancy, "it just went downhill from there" and Farley became "argumentative, very

demanding, condescending," and made comments "from time to time" suggesting that

Plaintiff could not handle her job anymore "as a result of her condition."  (Plaintiff Aff. ¶

5).  This piece of circumstantial evidence suffers from two fatal defects.  First, Plaintiff

could not give specific examples of how Farley treated her differently *because of* her

pregnancy.   (Plaintiff Dep. at 70-73).  Plaintiff's testimony is based on nothing more than

her self-serving, speculative belief that Farley's attitude and demeanor changed for the

worse following her pregnancy announcement. Such testimony, without finite examples

to support it, is insufficient to raise a triable issue.  *Mills v. First Fed. Sav. & Loan Ass'n

of Belvidere*, 83 F.3d 833, 841 (7th Cir. 1996) (holding that "the subjective beliefs of the

plaintiff . . . are insufficient to create a genuine issue of material fact") (citing *McMillian

v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989))).

Second, paragraph five of Plaintiff's affidavit, cited above, contradicts her prior

deposition testimony.  In her deposition, Plaintiff testified that when she informed Farley

of a problem or asked for her advice, Farley would respond with comments like, "What's

wrong with you?" or "Can't you handle it?"  (Plaintiff Dep. at 70-73; 116). When asked

to explain why she felt the question "Can't you handle it?" was discriminatory, Plaintiff

responded, "Because I was assuming that she meant because I was pregnant, and she had never said that to me before." (*Id*. at 112).  Upon further questioning, Plaintiff agreed that Farley never said anything to her tying her concerns about her work performance to her pregnancy. (*Id*. at 116; *see also* Plaintiff Dep. Ex. 32 (noting Farley's "couldn't handle it" comment and stating that Plaintiff was "[n]ot really sure what that meant").  A plaintiff may not "create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).  Accordingly, that portion of paragraph five of Plaintiff's affidavit suggesting that Farley thought Plaintiff could not handle her job anymore "as a result of her condition" is stricken.

Even if the court were to consider Farley's comments however, there is no evidence connecting those comments to the decision to terminate her employment. *Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006) ("When a plaintiff offers an employer's stray remark in a discrimination case, it is necessary to demonstrate 'some nexus' between the remark and the challenged employment decision.").  The evidence here suggests that those comments were made neither around the time of, nor related to, the termination of Plaintiff's employment to be of relevance in this case. (*See* Plaintiff Dep. at 116) (testifying that Farley asked her "whether [she] could handle it anymore" in July 2008, shortly after Farley issued the July memorandums; Plaintiff Dep. Ex. 32 (noting that Farley made the same comment in August 2008)).

As her second piece of circumstantial evidence, Plaintiff contends that, in her pre-

12

pregnancy March 2008 performance review, Farley viewed Plaintiff as meeting

requirements in five of the six areas of customer service; but just six months later, in her

September 2008 performance review, Farley viewed Plaintiff as meeting requirements in

only two of the six areas of customer service.  (Plaintiff Dep. Exs. 17, 18).  The only

difference between the two performance reviews, she argues, is that her ESQi score on

the September 2008 performance review was a mere one-half of a percentage point lower

than her March ESQi score (74.5).  According to Plaintiff, even Koch praised her

excellent job performance in a letter dated April 18, 2008 – a date soon after the

pregnancy announcement to Farley.

It is true that Plaintiff received lower scores in customer service in her September

2008 performance review as compared to her March 2008 performance review; however,

in both reviews, Farley found that Plaintiff did not meet Enterprise's corporate average

ESQi score, and did not meet Enterprise's overall performance expectation.  (*Compare*

Plaintiff Dep. Ex. 17, *with* Plaintiff Dep. Ex. 18).  Incidentally, Plaintiff's former

supervisor (Wilson) held similar views, and in fact, found Plaintiff's ESQi score

"unacceptable."  (*See* Plaintiff Dep. Ex. 16).  Thus, Plaintiff's issues with ESQi were not

new issues that arose with the advent of her pregnancy.

Koch's letter praising Plaintiff's number 3 position as Branch Manager in the

Indiana Group does not establish that Plaintiff was meeting Enterprise's performance

expectations in all areas of her position.  While the letter was congratulatory, Thompson

testified that if a branch manager finished in the top five of a certain matrix, Koch's

assistant would send out a form letter, like the one Plaintiff received, to the top "three or five" finishers.  (Thompson Dep. at 102).  Thompson explained that customer service was not part of the matrix, "so performance in other areas could have been good but [sic] still doesn't mean that customer service would have been good."  (*Id*.).  According to Thompson, customer service is the "most important factor" on which the performance of a branch manager is measured.  (*Id*.).

As her third piece of circumstantial evidence, Plaintiff cites to Farley's December 4, 2008, text messages asking Plaintiff whether she was "having the baby" and informing her that a Vincennes Branch employee "told her that [Plaintiff] was going to have the baby in the hospital."  (Plaintiff Dep. at 241-43).  After Plaintiff called Farley and informed her that she was not having the baby until a scheduled C-section on December 17, 2008, Plaintiff claims that Farley responded "Oh, good" and "See you tomorrow." (*Id*.).  From those messages alone, Plaintiff concludes that Farley was "frantic" and asks the court to infer that Farley was expressing relief that Plaintiff was not already in labor. (*Id*. at 251-52).  Plaintiff speculates that Farley fired Plaintiff the following day to prevent her from taking "forty (40) working days of 100 percent paid time off" under Enterprise's FMLA leave policy.

The statements attributed to Farley regarding Plaintiff's pregnancy are not, on their face, circumstantial evidence of pregnancy discrimination.  Farley's expression of surprise upon hearing the news of Plaintiff's pregnancy, Farley's concern that Plaintiff was in the hospital possibly delivering her baby earlier than expected, and Farley's

expression of relief that Plaintiff was not in pre-term labor, are entirely normal responses to news of this sort.  Plaintiff may have subjectively believed that Farley's words and text messages demonstrate Farley's discriminatory animus, but subjective belief is not evidence.

As her fourth piece of circumstantial evidence, Plaintiff argues that Farley wrote the November 25 memorandum, which gave Plaintiff the month of December to meet Enterprise's corporate minimum ESQi, as a cover to conceal Enterprise's pregnancy-based termination.  Although Farley informed Plaintiff that it was her "full expectation" that she "reach a minimum corporate average ESQi for the month of December 2008," it is undisputed that ESQi was based on a three-month average.  Both Farley and Thompson testified that when the three-month ESQi scores ending in November were released on December 3, 2008, Thompson called Farley to alert her that Plaintiff's scores for the Vincennes Branch had fallen to a twelve-month low (68).  (Farley Dep. at 51; Thompson Aff. ¶ 6).  During that conversation, the two decided there was no way Plaintiff could recover from the low score; consequently, they decided to terminate her employment.  (Farley Dep. at 51; Thompson Aff. ¶ 6).  This decision was made before Plaintiff's December 4 doctor's appointment scheduling her C-section.  Most importantly, as noted above, Plaintiff's poor ESQi scores were present at the Vincennes Branch even before her pregnancy.

There is one other issue tied to the November 25 memorandum worth noting.  Plaintiff complains that, in assessing her November ESQi score for the Vincennes

15

Branch, Farley and Thompson should have also considered the Sullivan Satellite's improved ESQi score. Had they done so, her combined score would have been better than a 68. Plaintiff argues that their failure to consider the Sullivan Satellite is further evidence of Enterprise's intentional discrimination.

There are three problems with Plaintiff's argument. First, the Sullivan Satellite was taken away from her oversight as of December 1, leaving only the Vincennes Branch. Thus, Sullivan's improved November score was irrelevant to Plaintiff's future performance at the Vincennes Branch. Second, since Sullivan had such a small fleet, its ESQi score was not weighted as heavily as the Vincennes Branch. Third, and most importantly, Plaintiff has not tied these employment decisions to her pregnancy.

Plaintiff's final piece of circumstantial evidence is Enterprise's alleged "shifting explanations" of who made the decision to terminate Plaintiff. In Enterprise's Answer to Interrogatory No. 2, Enterprise stated that Farley made the decision to terminate Plaintiff. Thompson testified that "the direct supervisor is always the one that will make a determination," and that "certainly, from a chain of command standpoint, [Farley] would have been that person in charge of [Plaintiff] to made that decision." (Thompson Dep. at 9-10). Thompson explained that "there was consultation between myself, between HR, between my boss, as far as confirmation, 'Hey, this is the route we intend to go,' so many people discussed it." (*Id*.). Farley testified that she did not "solely" make the decision; she consulted with Thompson, who then discussed the matter with Murphy and Koch. (Farley Dep. at 21). At most, Enterprise's Answer to Interrogatory No. 2 should have

16

been more specific about how termination decisions are made.  But the omission of

Thompson, and possibly Murphy and Koch, from the answer is immaterial.  What matters

is Enterprise's reason for Plaintiff's termination.  As to that issue, Enterprise has been

unwavering.

The pieces[2] of evidence relied upon by Plaintiff, taken together, fail to create a

convincing mosaic of circumstantial evidence from which a reasonable jury could infer

intentional discrimination on the part of Enterprise.  The court now turns to Plaintiff's

indirect case.

### 2.   Indirect Case

The indirect method requires a plaintiff to first establish a prima facie case of

discrimination.  This requires a plaintiff to show that: (1) she was pregnant and her

employer knew she was pregnant; (2) she was performing her job duties satisfactorily; (3)

she was terminated; and (4) similarly situated, nonpregnant employees were treated more

favorably.  *Griffin*, 489 at 844 (citing *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th

Cir. 2001)).  Once a plaintiff sets forth a prima facie case of discrimination, the burden

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for terminating

her.  *Id*.  If such a reason is advanced, the plaintiff can survive summary judgment only

by showing that the defendant's reason was a pretext for intentional discrimination.  *Id*.

---

[2] Evidence of similarly situated individuals outside of Plaintiff's protected class may also
provide circumstantial evidence of intentional discrimination.  *Troupe*, 20 F.3d at 736.  Because
Plaintiff did not discuss similarly situated individuals in her direct case, that element will be
discussed in her indirect case.

Plaintiff's indirect case falters on the second and fourth elements of her prima facie case.

### a.      Legitimate Expectations

The record is clear that Plaintiff consistently failed to meet Enterprise's legitimate expectations with regard to the most important performance indicator – ESQi.  This is exemplified in Plaintiff's performance evaluations of record, none of which reflect that she was meeting Enterprise's overall performance expectations.  To the extent Plaintiff's April 2008 letter from Koch contradicts these performance evaluations, the legitimate expectations prong views one's performance at the time of the employment decision. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002).  The letter was eight months prior to that decision, and thus, too remote to be of consequence.

### b.      Similarly Situated Individuals

Employees are similarly situated if they are directly comparable to her in all material respects, "but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotations and citation omitted). The similarly situated inquiry is "'a flexible, common-sense,' examination of all relevant factors."  *Id*. (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)).  In a typical case, this requires the plaintiff to show that the comparators "dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 847 (internal quotations and citations omitted).

Plaintiff's would-be comparators include branch managers at Branch Nos. 0874,

18

08A2, 0821, and 0802, who had the same or lower 12-month ESQi scores than Plaintiff

(73) on Enterprise's Branch Ranking Report dated December 3, 2008, but were not

terminated.  (*See* Plaintiff Dep. Ex. 23).  Thompson had responsibility over Branch Nos.

0874, 08A2, and 0802.  (Thompson Dep. at 32, 89, 90).  The record is not clear whether

he had responsibility over Branch No. 0821.  (*Id*. at 64-66).

Branch No. 0874 (Greenwood) and Branch No. 08A2 (Indianapolis) are satellite

offices; consequently, their ESQi scores are not weighed as heavily as a branch ESQi

because the ESQi score is based on a smaller sample size.  (Thompson Dep. at 25-26).

The identity of the branch manager of Branch No. 0821 (Mishawaka), as of December

2008, is not known.  (*Id*. at 26).  The court, therefore, cannot determine whether the

branch manager was in the same protected class as Plaintiff.  Finally, Branch No. 0802

(Indianapolis) was managed by two individuals in 2008: Cheryl Beatty and Ryan

Campbell.  (*Id*. at 90-93).  There is no evidence to show how long each managed the

branch in 2008, nor evidence of whether their respective ESQi scores were deficient for

more than a year.  (*Id*.).  In addition, at some point in 2008, Beatty was demoted to a

"Level 1 traffic coordinator position" due to her branch's low ESQi scores and received a

pay cut.  (*Id*. at 92).  None of these alleged comparators are similarly situated to Plaintiff.

### c.    Pretext

Even if Plaintiff had established a prima facie case of discrimination, Plaintiff is

unable to establish that Enterprise's stated reason for her termination – consistently poor

ESQi scores – was a mere pretext for discrimination.  "'Pretext means a dishonest

explanation, a lie rather than an oddity or an error.'" *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) (quoting *Bodenstab v. County of Cook*, 569 F.3d 651, 657 (7th Cir. 2009)).  In other words, Plaintiff must ultimately "show that [Enterprise] did not honestly believe in the reason[] it gave for terminating her." *Id.* at 478-79 (7th Cir. 2010) (citing *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002)).

Plaintiff's pretext argument centers around her theory that the November 25 memorandum was created solely to provide a facially legitimate reason to support Enterprise's pregnancy-based termination decision.  For the reasons previously set forth in the court's direct case analysis, Plaintiff fails to set forth a genuine issue of material fact that Enterprise did not honestly believe the reasons it gave for terminating Plaintiff's employment.  While Plaintiff may not agree with the decision and feels it is unfair, her disagreement does not cast doubt on the legitimacy of the decision.

Plaintiff has not shown, by either the direct or indirect methods of proof, that she was the victim of intentional pregnancy discrimination.  Accordingly, Enterprise's motion for summary judgment on her pregnancy discrimination claim must be **GRANTED**.

## B.    FMLA Interference Claim

Under the FMLA, an employer must not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights.  29 U.S.C. § 2615(a)(1).  An employee on FMLA leave has the right to be restored to the same or an equivalent position that she had before she took leave.  29 U.S.C. § 2614(a).  To prevail on an

20

FMLA interference claim, a plaintiff must establish that: "(1) she was eligible for the

FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to

take leave under the FMLA; (4) she provided sufficient notice[3] of her intent to take leave;

and (5) her employer denied her FMLA benefits to which she was entitled." *Makowski v.*

*SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011) (quoting *Goelzer v. Sheboygan*

*Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010)).  The parties do not dispute Plaintiff's

satisfaction of the first four elements.

To prevail on the fifth element, Plaintiff must show that Enterprise denied her

FMLA benefits that she was entitled to receive.  A termination to prevent an employee

from taking FMLA leave can certainly interfere with that employee's FMLA rights.  But

a termination for performance-based reasons does not.  An employer may fire an

employee for poor performance if she would have been fired even absent her leave.

*Simpson v. Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 712 (7th

Cir. 2009).  Here, the evidence shows that Plaintiff was fired for performance-based

reasons.  Accordingly, Enterprise's motion for summary judgment on Plaintiff's FMLA

interference claim must be **GRANTED**.

### C.    FMLA Retaliation

Under the FMLA, it is "unlawful for any employer to discharge or in any other

---

[3] Although Plaintiff did not specifically request FMLA leave, her request for maternity leave is sufficient to put her employer on notice of her intent to take leave. *See* 29 C.F.R. § 825.303(b) (employee need only establish that leave is requested for some reason covered by the FMLA).

manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  Similar to a pregnancy discrimination claim, "[i]n asserting a charge of retaliation under the FMLA, a plaintiff may proceed under the direct or indirect methods of proof."  *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 481 (7th Cir. 2006)).  Because it is not clear which method of proof Plaintiff relies on, in an abundance of caution, the court will analyze her claim under both.

FMLA retaliation claims are analyzed under the same standards as Title VII retaliation claims.  *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008) (citing *Burnett*, 472 F.3d at 481 n.5)).  Accordingly, to establish an FMLA retaliation claim under the direct method, a plaintiff "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Id.* (citing *Humphries v. CBOS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).

Plaintiff's theory of her case is that she was terminated the day after informing Farley of her scheduled C-section to preclude her from taking advantage of Enterprise's generous FMLA policy.  Plaintiff's claim thus hinges on suspicious timing, but suspicious timing alone is rarely sufficient to create a triable issue.  *Simpson*, 559 F.3d at 713 ("Temporal proximity between an adverse employment action and a plaintiff's exercise of her statutory rights 'will rarely be sufficient in and of itself to create a triable

issue.'") (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002))).  To survive summary judgment, a plaintiff must present evidence in addition to suspicious timing that supports an inference of a causal link.  *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[S]uspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link.").

Here, there is no evidence besides the timing of her termination that supports the inference of a causal link.  For example, there is no evidence that Farley or Thompson ever said anything negative to her regarding her need for maternity leave, nor evidence that they frowned upon the news of her impending C-section.  Plaintiff's suspicious timing argument is further undercut by her own testimony that she informed Farley of her pregnancy approximately eight months before her due date.  Although Plaintiff could not remember when she asked for time off for purposes of maternity leave, Farley was put on notice of her eventual need for leave.  In sum, there is no evidence in the record from which a reasonable jury could conclude that Enterprise terminated Plaintiff for retaliatory reasons.

To establish an FMLA retaliation claim under the indirect method, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate job expectations; and (4) she was treated less favorably than a similarly situated employee.  *Simpson*, 559 F.3d at 718 (citing *Caskey*, 559 F.3d at 593).  For the reasons set forth previously, Plaintiff

cannot establish that she was meeting Enterprise's legitimate job expectations.  Further, she cannot establish that she was treated less favorably than similarly situated employees not in her protected class.

Plaintiff fails to establish her FMLA retaliation claim under either the direct or indirect methods of proof.  Accordingly, Enterprise's motion for summary judgment on Plaintiff's FMLA retaliation claim must be **GRANTED**.

## IV.   Conclusion

For the reasons set forth above, Enterprise's Motion for Summary Judgment (Docket # 42) is **GRANTED**.

**SO ORDERED** this  21st  day of September 2012.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record

24